Brownsville Lodge No. 357, Knights of Pythias
et al., *v.* Great American Indemnity Company,
Appellant, et al.

554

Argued April 20, 1937.

Before KELLER, P. J., CUNNING-
HAM, BALDRIGE, STADTFELD, PARKER, JAMES and
RHODES, JJ.

*W. Brown Higbee,* of *Higbee, Matthews & Lewellyn,*
for appellant.

*H. Vance Cottom,* with him *Norval R. Daugherty,*
for appellees.

OPINION BY CUNNINGHAM, J., October 13, 1937:

The action below was assumpsit upon a bond given
by the defendant indemnity company to the Browns-
ville Lodge of the Knights of Pythias. It resulted from
the closing of the Monongahela National Bank of

Brownsville, as a consequence of which the lodge lost the sum of $1,886.67, representing the balance of deposits made therein by its officials in various accounts. The defense was that under the terms of the bond, set forth below, the type of loss involved was not covered. At the close of the trial, the court below directed a verdict for the plaintiff in the full amount of its claim, with interest from April 6, 1931, and also directed a verdict in favor of certain officials who had been brought in by sci. fa., as additional defendants. The defendant company has appealed.

The bond in suit is headed "Fraternal Order, Form C." By it the appellant agreed to indemnify the lodge "against the loss of any money or other personal property of the Assured through its [the] failure, during the term of this bond, of any persons, hereinafter called Officials, holding the offices named in statement numbered four of the said schedule, faithfully to perform the duties of their offices, faithfully to comply with the constitution and by-laws of the Assured, and fully to account for the said money or other personal property after having received the same during the said term in their official capacity *whether such failure results from the default of a depository or otherwise."* (Italics supplied)

Statement No. 4 of the schedule provides: "The names of the offices, and the limit of the liability of the company as respects each office, are as follows:

| Item | Name of Office | Limit of Company's Liability |
|------|----------------|------------------------------|
| A | Trustee | |
| | Brownsv. Lodge No. 357 | $1,000.00 |
| B | Trustee | |
| | Brownsv. Lodge No. 357 | 1,000.00 |
| C | Trustee | |
| | Brownsv. Lodge No. 357 | 1,000.00 |

| D | Master of Exchequer | |
| | Brownsv. Lodge No. 357 | 500.00 |
| E | Master of Finance | |
| | Brownsv. Lodge No. 357 | 100.00" |

In addition to this statement, it is expressly provided, as a condition of the bond, that "the liability of the company on account of any one official shall not exceed the amount in the said schedule set opposite the name of the office held by such official." The term of the bond was one year, beginning at noon November 28, 1930.

The evidence establishes the fact that the lodge, soon after its organization, adopted a resolution designating the Monongahela National Bank as its depository, and all officers of the lodge were required to, and did, carry their accounts in that bank. The finances of the lodge were managed by five individuals holding the offices specified in the bond. Its funds were handled in the following manner:

Dues of the members were paid in the first instance to the Master of Finance, who, in turn, immediately paid the sums he received to the Master of the Exchequer. The latter deposited the money weekly in the Monongahela National Bank in an account in his name known as the General Fund. As this fund accumulated, the moneys deposited therein were, from time to time, transferred to separate funds known as the Funeral Fund, Pin Money Fund, Orphans' Fund and Savings Fund.

At the time the bank closed, the amounts in the various funds were:

| General Fund | $ 185.97 |
| Funeral Fund | 71.85 |
| Pin Money Fund | 5.86 |
| Orphans' Fund | 133.22 |
| Savings Fund | 2,551.00 |

Up to the time of trial, the bank had paid three dividends, which amounted to 36% of the deposits, so that

at that time the lodge was out of pocket the following sums:

| | |
|---|---:|
| General Fund | $ 119.01 |
| Funeral Fund | 46.00 |
| Pin Money Fund | 3.75 |
| Orphans' Fund | 85.27 |
| Savings Fund | 1,632.64 |
| Total | $1,886.67 |

The Orphans' Fund and Savings Fund were carried in the names of the trustees of the lodge. A large part of the testimony related to the powers of the trustees with respect to the funds under their control. The uncontradicted evidence is that these powers were extremely limited. Apparently no bill could be paid or transfer made except by a special resolution of the lodge. When it had been determined that money should be transferred from the General Fund into one of the special funds, the Master of the Exchequer would draw a check to the order of the trustees for the amount which the lodge had voted to transfer. The trustees would present this check to the bank, together with a letter from the recording secretary, containing the authorization for the transfer. When the trustees withdrew any of the funds from the bank, it was again necessary for them to obtain a written order from the lodge, sealed with its seal, signed by the presiding officer and attested by the keeper of records and seal. This would be presented to the cashier of the bank, who would issue a cashier's check in the amount specified by the written order.

The crux of the case is the proper construction of the above italicized concluding portion of the indemnifying clause, which insures the lodge against any loss through the failure of any of its officials "fully to account for the said money......after having received the same......in their official capacity whether such

failure results from the default of a depository or otherwise."

If it be determined that this clause covers the loss, appellant raises three subsidiary questions: First, that its liability as to the funds handled by the trustees themselves must be limited to $1,000; second, that appellant should be entitled to recover over against the officials in question; and third, that there should not have been a directed verdict for plaintiff, since its case depended upon oral testimony.

We are unable to agree with the contention of appellant upon the major proposition. It is thus summarized in its brief:

"Appellant undertook and guaranteed that the officers would faithfully perform their duties and would account for all moneys entrusted to them. Any money in their hands lost or embezzled by them or stolen from them or lost by reason of the failure of their own depository would be repaid. However, the testimony clearly establishes that the officers accounted to the lodge for the money when they placed it in the bank duly designated by the lodge as its depository. The money at that time belonged to appellee and was not in the custody or control of any of its officers, nor was it subject to their jurisdiction or disposal.

"The officers did not fail to account. There has been no loss because of a failure to account. There is therefore no liability on the bond."

As we view the matter, the fallacy of this argument lies in the failure of appellant properly to distinguish between the various types of risk insured against by the bond. It is true that the bond is, in the first place, a fidelity bond; that is, it guarantees that the officers will faithfully perform the duties of their respective offices. But it goes farther. It indemnifies against the failure of those officers fully to account for moneys received by them, *whether such failure results from the default of a depository or otherwise.* In brief, appel-

lant claims that the officers have not failed to account because they are under no personal obligation to repay to the lodge the funds that were lost by the closing of the bank. Since the officers placed the funds in a depository designated by the lodge, they have accounted, so the argument goes, by their report to the lodge that the depository, which it chose, has closed its doors. If the word, "account", were alone used in the bond and in its technical sense, the argument would be convincing. It has a fixed meaning in law. It describes the obligation of a trustee or other fiduciary to give a satisfactory report of his handling of the funds of another. He must either show that he has those funds on hand, or that they have been expended for proper purposes, or that they have been lost through no fault of his own. In this sense, the officers of the lodge duly accounted for the funds deposited in their name when they reported the failure of the bank. The term, however, cannot be divorced from the qualifying phrases which follow. If the parties intended that a fiduciary should be considered as having "accounted" for funds by showing the failure of the depository in which they were placed, then the added clause is meaningless. We prefer the alternative conclusion that the term "account" was not used in its technical sense; we cannot favor a construction which would render a portion of the insuring clause an empty gesture.

We think it clear that this bond was intended to cover more than is covered in the usual fidelity bond, which merely guarantees faithful performance of the duties of the officers described therein. It is equally clear that the additional clause must be given some meaning and that that meaning should be a common sense one. This end can be reached, in our opinion, only by construing the bond to mean that appellant is responsible for the loss of funds placed in any closed bank by the designated officers of the lodge, after having been received in their official capacity.

It is a sound rule of construction that where the meaning of a contract is in doubt, the circumstances existing at the time the contract was executed may be examined to aid in determining the real intent of the parties. When this is done, we think the meaning becomes apparent. Appellant knew it was dealing with a Fraternal Order. It knew also that officers of such an organization are not under the same absolute duty to account as is imposed on certain municipal servants, such as tax collectors. Hence, it was aware that neither the trustees nor the other fiscal officers of the lodge would ordinarily have been held responsible for the failure of a depository, at least unless the deposit had been made in violation of the instructions of the lodge. The bond, in its other provisions, guarantees that the officers will perform their duties faithfully and will comply with the constitution and by-laws of the assured. The evidence shows that one of the duties imposed by the constitution and by-laws was to place the funds of the lodge in the particular bank which failed.

Therefore, it seems logical to assume that the lodge intended to get and the appellant to give a guarantee that the former would be reimbursed for any default of the depository. The Monongahela National Bank had been designated as the depository long before the bond was written. This fact, as well as the other restrictions upon the handling of the funds, was readily discoverable by appellant, and we may safely assume that the bank's condition was investigated by it as a cautionary measure before the obligation was undertaken. These restrictions upon the officers of the lodge afforded appellant additional protection; they should not be used now as a ground for evading its responsibilities.

Moreover, if there be any doubt as to the proper construction to be placed upon the bond, that doubt should be resolved in favor of the lodge. The obligation is not a surety bond. The officers are not named as principals

therein. It constitutes a contract insuring against certain risks incident to the handling of the funds of the lodge. It should, therefore, be construed, as other contracts of insurance are construed, in a manner favorable to the insured: *Equitable Trust Company v. National Surety Company*, 214 Pa. 159, 63 A. 699. (See also 25 C. J. 1091).

Having concluded that the loss was within the coverage of the bond, we come next to the extent of the risk assumed by appellant. On this point, we are of opinion that the liability of appellant, as regards the particular funds held in the names of the trustees, should not exceed $1,000. The bond provides, as noted above, the following limitations on the liability of appellant on account of any one official: Master of Finance, $100; Master of Exchequer, $500; and as to the three trustees, $1,000, each. The Master of Finance may be ignored, since it does not appear that any accounts were carried in his name. Of the remaining accounts, three, the General Fund, Funeral Fund and Pin Money Fund, were apparently carried in the name of the Master of the Exchequer. Since the unpaid balances remaining in these funds does not exceed $500, liability for these balances follows from what we have said. The evidence indicates, however, that accounts of both the Orphans' Fund and the Savings Fund were carried in the names of the trustees. The unpaid balances of these two funds totaled $1,717.91. The court below held, in effect, that where the trustees acted together the liability as to each might be aggregated so that there would be a total coverage of $3,000. We think this construction is not in accord with the intent of the bond. The loss is an indivisible one. It does not involve the separate and distinct action of several trustees but merely an account carried jointly in their names. Nor is there involved any unlawful act on the part of the trustees with regard to the funds, in which case they might be held both jointly and severally liable. Since the trustees acted as

a unit and since there was no liability on their part to the lodge, the loss cannot be split up into three separate items, each traceable to an individual trustee. It cannot be said that the loss was greater by reason of the fact that there were three trustees instead of one. For these reasons, the judgment should be reduced so that the liability, as respects the Orphans' Fund and Savings Fund, will not exceed $1,000, or a total liability of $1,168.76.

The remaining questions require but brief discussion. Appellant contends that if it is to be charged with liability, it should be permitted to recover over against the particular officers who were named as additional defendants. Such recovery over, however, could be permitted only if the officials were themselves liable personally to the lodge in the first instance. As has been pointed out, the liability of appellant, in this case, does not arise by reason of any default on the part of the trustees or the other fiscal officers, but because of the clause guaranteeing the solvency of the bank. Consequently, the court below did not err in directing a verdict in favor of the additional defendants.

Finally, we are not persuaded that the case should have been submitted to the jury. It is true, as a general proposition, that where the plaintiff's case is based solely upon oral testimony, the truth of which is not admitted by the defendant, a verdict cannot be directed in favor of the plaintiff: *Nanty-Glo Borough v. American Surety Company*, 309 Pa. 236, 163 A. 523. This rule should not apply, however, where the defendant either concedes the facts to be true or adopts them as part of its own case. The essential facts as to the deposit of the funds and the failure of the bank were admitted by the pleadings and were not in issue. It is true that considerable testimony was introduced as to the manner in which the funds were handled under the regulations of the lodge. This evidence, however, was not only accepted as true by appellant but developed

by it and made the basis of its argument on this appeal. In fact, as has been indicated, its major contention rests upon the designation of the bank as the depository of the lodge and the alleged consequent absence of liability or responsibility on the part of the trustees. Under such circumstances, appellant cannot successfully invoke the rule of the Nanty-Glo Borough case.

Judgment modified and as modified affirmed.